UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                    )
DiJUAN JACKSON,                     )
                                    )
       Petitioner,                  )
                                    )
v.                                  )   Civil Action No. 06-10066-RGS
                                    )
MICHAEL A. THOMPSON,                )
                                    )
       Respondent.                  )
_____)

REPORT AND RECOMMENDATION ON
PETITION FOR WRIT OF HABEAS CORPUS

January 3, 2007

SOROKIN, M.J.

On January 12, 2006, DiJuan Jackson, through counsel, petitioned for writ of habeas corpus pursuant to 28 U.S.C. § 2254, as amended by the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA). Before this court are the parties' briefs in support of and in opposition to the petition.

FACTUAL BACKGROUND[1]

At approximately 8:35 p.m. or 8:40 p.m. on June 5, 1999, a shooting occurred on Greenfield Road in Mattapan. (Trial Transcript Volume II, 131:40-132:5). A large crowd gathered on Greenfield Road as the victim, Shaun Tilghman, lay in the street. (Id. at 132:11-133:4). Mr. Tilghman died of a gunshot wound to the chest. (Trial Transcript Volume IV, 212:13-14). On the following afternoon, Boston police found three spent .32 caliber shell

_____
[1] As the Massachusetts Appeals Court did not make any findings of fact, the following facts have been taken from the trial transcript.

casings on a sidewalk of Greenfield road. (Id. at 70:22-71:2, 104:14-24).

Sixteen-year-old witness Carl Salvas testified that at 8:00 p.m. or 8:15 p.m. on the night of the shooting, he was outside on Greenfield Road with three friends, Jaron O'Bannon, Michael Tousant, and Damien Perry. (Trial Transcript Volume III, 218:1-4). Salvas testified that the four of them walked to a liquor store and were accompanied by Shaun Tilghman, who was traveling on a bicycle. (Id. at 218:16-219:15). According to Salvas' testimony, at some point Tilghman said that he was going back to the store because he forgot something. (Id. at 221:5).

Salvas and the others continued walking, stopped in front of a driveway, and while they were on the driveway, they heard three gunshots. (Id. at 222:21). Salvas saw Tilghman fall against a van and onto the ground. He also saw a man with a gun in his hands and a nylon stocking covering his face, running away from where Tilghman lay. (Id. at 224:1-22). At trial, Salvas identified the petitioner as the shooter. (Id. at 230:1-10).

Jaron O'Bannon testified that after he heard the gunshots while on the driveway with his friends, he jumped over two fences and ended up in "the little forest" behind the houses on Greenfield Road in between Roseberry Road and Radcliffe Road. (Id. at 69:12-71:24). O'Bannon further testified that at some point he saw the petitioner, who had a black gun in his hands, walk over towards him. (Id. at 73:6-76:9). O'Bannon said, "I ain't got no problems," and the petitioner grabbed O'Bannon by the shirt and hit him in the face with the gun. (Id.) O'Bannon lost five teeth and received four chipped teeth, and his lips required stitches. (Id. at 83:17-19).

PROCEDURAL BACKGROUND

On May 24, 2001, the petitioner was convicted of (1) assault and battery by means of a dangerous weapon; and (2) possession of a firearm. (Petitioner's Memo. at 2). On May 29, 2001, he was sentenced to incarceration for a minimum of nine years and eleven months, and a maximum of ten years on the charge of assault and battery by means of a dangerous weapon. (Transcript Disposition, 24:10-17). On the charge for possession of a firearm, he was sentenced to a consecutive term of incarceration for a minimum of four years, eleven months and a maximum of five years. (Id. at 24:18-25:1).

On May 30, 2001, following his conviction, the petitioner filed a notice of appeal in the Massachusetts Appeals Court. On June 18, 2004, the Massachusetts Appeals Court, in an unpublished opinion, affirmed the convictions. See Commonwealth v. Jackson, 61 Mass.App.Ct. 1111 (2004) (table opinion) (Docket #8). Petitioner then filed an application for leave to obtain further appellate review ("ALOFAR"), which the Supreme Judicial Court denied. See Commonwealth v. Jackson, 442 Mass. 1107 (2004) (table opinion) (Docket #8). Petitioner then petitioned to the United States Supreme Court for writ of certiorari, but the petition was denied. Jackson v. Massachusetts, 543 U.S. 1128 (2005).

This habeas petition followed. In it, petitioner cites two grounds for relief: 1) that the trial judge violated petitioner's right against self-incrimination under the 5th and 14th amendments by sentencing petitioner more harshly for his silence; and 2) that the trial judge violated his right of confrontation under the 6th and 14th amendments by precluding reasonable cross-examination of Jaron O'Bannon with regard to a charge pending against him.

STANDARD OF REVIEW

28 U.S.C. Section 2254(d)(1), as amended by AEDPA, provides, in pertinent part:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.

28 U.S.C. § 2254(d).

The strict standard of review required by the AEDPA only applies to claims that were adjudicated on the merits in state court proceedings; otherwise the court is required to apply de novo review. Norton v. Spencer, 351 F.3d 1, 4-5 (1st Cir. 2003). Faced with a state court opinion that does not decide constitutional claims, federal courts are required to apply de novo review. See DiBenedetto v. Hall, 272 F.3d 1, 6-7 (1st Cir. 2001), citing Fortini v. Murphy, 257 F.3d 39, 47 (1st Cir. 2001). ("If the state court has not decided the federal constitutional claim (even by reference to state court decisions dealing with federal constitutional issues), then we cannot say that the constitutional claim was 'adjudicated on the merits' within the meaning of § 2254 and therefore entitled to the deferential review prescribed in section (d). . . we can hardly defer to the state court on an issue that the state court did not address.")

Petitioner advanced both of his two federal attacks on his conviction to the Massachusetts Appeals Court. In denying ground one, the Fifth Amendment claim, the Appeals Court did not cite federal law. Even in such a circumstance, de novo review does not always apply. In cases where the state court explicitly notes that it is "articulating a state law standard that is more favorable to defendants than the Federal Constitution . . . we will presume the federal law

adjudication to be subsumed within the state law adjudication." McCambridge v. Hall, 303 F.3d 24, 35 (1st Cir. 2002). Such is not the case here. Thus, de novo review applies to ground one.

In rejecting petitioner's other argument, the cross-examination claim, the Appeals Court relied upon Commonwealth v. Haywood, 377 Mass. 755 (1979) as to ground two of the petition. Haywood, in turn, cites to Davis v. Alaska, 415 U.S. 308 (1974), and applies the analysis of Davis to facts very similar to those raised by petitioner, stating in conclusion that "Davis [does not hold] that a defendant may introduce into evidence the arrest or probation records of adverse witnesses in all circumstances. Therefore, the judge could make an appraisal of the materiality of the testimony sought in light of Haywood's right 'to show specific bias or motive to prevaricate on the part of the government witness.'" Haywood, 377 Mass. at 761 (quoting Commonwealth v. Santos, 376 Mass. 920 (1978)). Because the Appeals Court, by applying federal law, by way of Haywood, adjudicated the petitioner's federal claim, de novo review does not apply to ground two of the petition, rather the strict review standard of 28 U.S.C. § 2254 applies.

## DISCUSSION

In imposing sentence, the trial judge stated:

> This gentleman, in my view, is an extremely dangerous man. You say that I've seen many more dangerous. Perhaps. I don't really keep track, but this man ranks right up there in terms of his record. He is a persistent violent offender, a deadly offender from the age of fourteen, numerous convictions of serious violence, starting with a manslaughter at age fourteen, numerous weapons convictions.
>
> In this case, he treated the victim with particular cruelty. There is no reason to believe that O'Bannon, whatever his record happened to have been, was anything but an innocent bystander in this. He knocked five front teeth out with a pistol. There is no explanation, no indication of any remorse, no context. He just knocked his teeth out. That, in my opinion, is treatment of a person with particular cruelty and warrants, in my opinion, a

departure from the guidelines.²

This gentleman deserves to be incarcerated for as long a period of time as I can possibly commit him to.  In my view, the government recommendation is lenient.  This gentleman deserves the most severe penalty for what he did. . . .

Tr. Disp., at 22:19 - 23:21.  Petitioner argues that the trial judge sentenced him more harshly because of his silence in violation of the Fifth Amendment.  Petitioner cites the judge's statement "There is no explanation, no indication of any remorse, no context," Tr. Disp. at 23:5-15, and the fact that he received the maximum sentence allowed.

The Fifth Amendment protections against self-incrimination do apply at sentencing proceedings.  See Mitchell v. United States, 526 U.S. 314, 326-327, 328-329 (1999).  No violation of these protections occurred.  The trial judge commented upon the facts of the crime itself, that it was an unprovoked attack committed without explanation or context that might mitigate the otherwise obvious cruelty of the offense.  This in no way treads upon the petitioner's constitutional right to silence.

Neither the quoted context in which the trial judge made the challenged statement nor for that matter the entire transcript of the disposition suggest the trial judge focused upon or enhanced the petitioner's sentence due to petitioner's silence.  The trial judge was permitted to reach conclusions based upon the evidence before him and permissible inferences drawn therefrom.  The facts of the crime spoke of an unprovoked violent attack of "particular cruelty." The petitioner's record, according to the trial judge, described a "persistent violent offender." The comment that there was "no indication of any remorse" was an observation of the state of the

---

²The trial judge's "departure" was actually the maximum time allowed within the sentencing guidelines, 10 years for the assault conviction and 5 years for the illegal firearms conviction.

record: there was no evidence of any remorse. The trial judge could consider absence of remorse in determining the severity of a sentence. See United States v. Schneiderhan, 404 F.3d 73 (1st Cir. 2005) (First Circuit affirmed district court decision where district court justified the severity of the sentenced based on the "severity of the crime and . . . lack of remorse."); Correia v. Hall, 364 F.3d 385 (1st Cir. 2004) (Habeas relief denied where state court sentence was harsher than that discussed during pre-trial because of sentencing judge's findings of "recklessness . . . and . . . apparent lack of remorse."); see generally United States v. Grayson, 438 U.S. 41, 98 (1978) ("[W]e have acknowledged that a sentencing authority may legitimately consider the evidence heard during the trial, as well as the demeanor of the accused.") See also Bohan v. Kuhlmann, 234 F.Supp. 2d 231, 271 (S.D.N.Y. 2002) ("While the Fifth Amendment provides a 'safeguard against judicially coerced self-disclosure' that extends to the sentencing phase of a criminal proceeding, it does not bar a court from considering a defendant's lack of remorse." (citing Mitchell, 526 U.S. at 322.)).

     Finally, the Supreme Court's decision in Mitchell is not of assistance to petitioner. In that case the Court found that in sentencing, a judge cannot use a defendant's silence to *determine facts of the case.* See id. at 330 (emphasis added). Here, there is no allegation that the trial judge used petitioner's silence to determine the facts of the case. Certainly, in Mitchell, the Supreme Court noted that "[w]hether silence bears upon the determination of a lack of remorse, or upon acceptance of responsibility for purposes of the downward adjustment provided in § 3E1.1 of the United States Sentencing Guidelines (1998), is a separate question." Id.. It is not before us, and we express no view on it, They ruled that question was not presented and expressed not view on it. Id. But this is not a case in which the sentencing judge drew an

7

inference from the defendant's silence. Rather, the trial judge sentenced petitioner based upon his criminal record and the circumstances of the offenses for which he was convicted. Thus, Petitioner has failed to establish a violation of his Fifth Amendment right to silence.

Petitioner next argues that the trial judge violated his sixth amendment right to confrontation by precluding him from cross-examining witness Jaron O'Bannon as to the fact that there was a charge pending against O'Bannon at the time of trial. On the day after the attack O'Bannon identified petitioner to the police as the assailant. (Trial Tr. Vol. III at 86 - 88). At that time, O'Bannon did not disclose that Damien Perry was with O'Bannon on June 5th; Perry had asked O'Bannon not to reveal his name to the police. Id. at 96. Subsequently, O'Bannon testified before a grand jury. Id. at 101. Again, he identified the petitioner as the assailant. Trial Id. at 133. In identifying the persons on the driveway O'Bannon included Perry along with Tousant and Salvas. He also testified that he, O'Bannon, was smoking a cigarette. Id. at 101-103. At trial, O'Bannon again admitted Perry was present on June 5th and conceded that he, O'Bannon, had been smoking a marijuana joint on June 5th, not a cigarette as he had told the grand jury. Id. at 66 - 68. Counsel for petitioner cross-examined O'Bannon about these different statements. Id. at 96, 101-103. Counsel also wanted to impeach O'Bannon with the fact that at the time of the trial he was facing a pending charge. The pending charge arose after O'Bannon's grand jury testimony, but prior to his trial testimony.[3] Id. at 27. Counsel argued the charge

---

[3]Respondent states in a footnote:
At the time of trial, O'Bannon was facing a charge for unlawful possession of either ammunition or a firearm; the record is unclear as to which. Trial Tr. Vol. III at 27-28. In addition, while the record does not indicate precisely when the charge arose, there is no dispute that it happened sometime between O'Bannon's grand jury testimony and trial. Trial Tr. Vol. III at 27.

showed bias or a motive to curry favor with the prosecutor.

The trial judge precluded this cross-examination reasoning "there would only be bias if he [O'Bannon] had a pending charge at the time that he gave his testimony that favors the Commonwealth." Id. at 29.  The Appeals Court affirmed, holding essentially that under Davis v. Alaska, 415 U.S. 308 (1974), the trial judge properly appraised the materiality of the testimony in light of the right to show bias and rejected it.

Petitioner argues that the inconsistencies between O'Bannon's earlier statements (made prior to the existence of the pending charge) and his trial testimony, coupled with the pending charge he was facing, cast doubt on his credibility as a witness.  Petitioner relies principally on Davis v. Alaska, 415 U.S. 308.

Davis, however, differs from the case at bar because in that case, all of the incriminating statements made by the witness were made while the motive to curry favor with the government existed.  In contrast, O'Bannon had named the petitioner as his assailant the day following the attack, identified him in a photo array, and testified before the grand jury that he was the assailant, all before the unlawful possession charge arose.  In addition, Davis does not stand for the proposition that cross-examination is unlimited.  See United States v. Berrio-Londono, 946 F.2d 158, 160 (1st Cir. 1991)  ("[T]he right to cross-examination is not absolute."). In these circumstances the Appeals Court's decision is neither contrary to nor an unreasonable application of Davis.

In addition, the First Circuit has established a framework for determining whether a limitation on cross-examination is damaging to testimony.  As the First Circuit noted in

DiBenedetto v. Hall, "[t]he first question to be asked . . . is whether the limitation prejudiced the examination of a particular witness. In other words, absent the limitation, *would the jury have received a 'significantly different impression' of the witness's credibility?* The second element of the Van Arsdall test is whether the error was harmless beyond a reasonable doubt; if so, reversal is not warranted." 272 F.3d at 10 (emphasis added) (citing Delaware v. Van Arsdall, 475 U.S. 673, 679-681 (1986)). Bias in the form of currying favor with the prosecutor, the basis for seeking the impeachment in the present case, would not have given the jury a "significantly different impression" of O'Bannon in this case. O'Bannon twice identified petitioner prior to the pending charge, once under oath before the grand jury.

Petitioner further argues that the trial judge was in error to preclude the cross-examination based on the determination that O'Bannon's testimony was credible, based on Crawford v. Washington, 541 U.S. 36 (2004). This contention is not borne out of the record. Neither the trial judge nor the Appeals Court made a determination as to O'Bannon's credibility. Rather, the request to impeach O'Bannon with the pending charge was rejected on the grounds that it did not support the theory under which it was advanced – showing bias to curry favor with the prosecutor.

For all of the foregoing reasons, the Appeals Court's decision was not contrary to nor an unreasonable application of federal law as determined by the Supreme Court.

## CONCLUSION

For the foregoing reasons, I recommend to the District Judge to whom this case is assigned that the Petition be DENIED.[4]

                                                                /s/  Leo T. Sorokin

                                                                United States Magistrate Judge

---

[4] The parties are hereby advised that any party who objects to these proposed findings and recommendations must file a written objection thereto within 10 days of receipt of this Report and Recommendation. The written objections must identify with specificity the portion of the proposed findings, recommendations, or report to which objection is made, and the basis for such objections. See Fed. R. Civ. P. 72 and Habeas Corpus Rule 8(b). The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b) will preclude further appellate review of the District Court's order based on this Report and Recommendation. See Keating v. Secretary of Health and Human Services, 848 F.2d 271 (1st Cir. 1988); United States v. Emiliano Valencia-Copete, 792 F.2d 4 (1st Cir. 1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603 (1st Cir. 1980); United States v. Vega, 678 F.2d 376, 378-379 (1st Cir. 1982); Scott v. Schweiker, 702 F.2d 13, 14 (1st Cir. 1983); see also Thomas v. Arn, 474 U.S. 140, 106 S.Ct. 466 (1985).